UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Julie Grupke,                                    Docket No. 13-cv-913 (PAC)

               Plaintiff,

        -against-

GFK Custom Research North America,

             Defendant.

---

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................... 1

STATEMENT OF FACTS ......................................................................................... 2

ARGUMENT .......................................................................................................... 17

I.      SUMMARY JUDGMENT STANDARD ................................................... 17

II.     PLAINTIFF WAS AN EXEMPT ADMINISTRATIVE EMPLOYEE UNDER
        THE FLSA ............................................................................................... 18

        A.      Plaintiff's Pay Satisfied the Salary Requirement ................................... 19

        B.      Plaintiff's Primary Duty was Administrative Work ............................. 19

        C.      Plaintiff's Primary Duty Required the Exercise of Discretion and
                Independent Judgment ....................................................................... 21

III.    GFK IS EXEMPT FROM THE OVERTIME PROVISIONS OF THE MMWL .......... 24

CONCLUSION ...................................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Alberti v. Cnty. of Nassau,*
   393 F. Supp. 2d 151 (E.D.N.Y. 2005) .................................................................20

*Anderson v. Liberty Lobby,*
   477 U.S. 242 (1986)......................................................................................17

*Arrington v. Michigan Bell Tel. Co.,*
   746 F. Supp. 2d 854 (E.D. Mich. 2010)........................................................24, 25

*Broich v. Inc. Vill. of Southampton,*
   2011 U.S. Dist. LEXIS 6954 (E.D.N.Y. Jan. 25, 2011) .........................................18

*Celotex v. Catrett,*
   477 U.S. 317 (1986)......................................................................................17

*Gan v. City of N.Y.,*
   996 F.2d 522 (2d Cir. 1993)............................................................................17

*Klein v. Torrey Point Group, LLC,*
   2013 U.S. Dis. LEXIS 152875 (S.D.N.Y. Oct. 23, 2013) ..........................22, 23, 24

*Krause v. Merrill Lynch,*
   2011 U.S. Dist. LEXIS 40397 (S.D.N.Y. Apr. 13, 2011).......................................20

*Krumholz v. Vill. of Northport,*
   873 F. Supp. 2d 481 (S.D.N.Y. 2012).............................................................18, 20

*Matsushita Elec. Indus. v. Zenith,*
   475 U.S. 574 (1986)......................................................................................17

*O'Neill v. Omni Hotels Mgmt Corp.,*
   2001 U.S. Dist. LEXIS 2138 (S.D.N.Y. Mar. 2, 2001) ....................................20, 21

*Raffe v. Am. Nat'l Red Cross,*
   2011 U.S. Dist. LEXIS 137340 (N.D.N.Y. Nov. 20, 2011) ...................................21

*Scarpinato v. East Hampton Point Mgmt. Corp.,*
   2013 U.S. Dist. LEXIS 131338 (E.D.N.Y. Sept. 13, 2013)................................21, 24

## TABLE OF AUTHORITIES
### CONTINUED

**Page(s)**

**STATUTES**

29 U.S.C. § 207(a)(1)................................................................................18

29 U.S.C. § 213(a)(1)................................................................................18

29 U.S.C. § 255(a) ....................................................................................18

Fair Labor Standards Act .................................................................... passim

Mich. Comp. Laws § 408.394(1) .............................................................24

**OTHER AUTHORITIES**

29 C.F.R. § 541.200 ......................................................................18, 19, 22

29 C.F.R. § 541.201 ..........................................................................19, 20

29 C.F.R. § 541.202 ..........................................................................22, 23

29 C.F.R. § 541.700(a)..............................................................................19

Rule 56 of the Federal Rules of Civil Procedure .................................1, 17

Defendant GfK Custom Research North America ("GfK") respectfully submits this Memorandum of Law in support of its motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

This is a misclassification case in which Plaintiff Julie Grupke ("Plaintiff") alleges GfK violated the Federal Labor Standards Act ("FLSA") and the Michigan Minimum Wage Law ("MMWL") by failing to pay her overtime compensation. Both claims fail as a matter of law.

Plaintiff was employed as Research Manager and Senior Research Manager in GfK's Automotive Division. Plaintiff was primarily responsible for the management of various automotive market research studies. As the undisputed material facts will demonstrate, Plaintiff's self-described "operations" role required many tasks directly related to GfK's general business operations, including, among other things, auditing, budgeting, cost forecasting, vendor management, quality assurance, and issue investigation and resolution. She exercised significant discretion and independent judgment with respect to matters of significance in carrying out those tasks. In fact, she testified in detail about the decision-making process she frequently followed. Thus, her FLSA claim fails because she was properly categorized as exempt under the administrative exemption.

Plaintiff's claim under the MMWL is also without merit. By its own terms, the MMWL does not apply to employers covered by the FLSA. It is undisputed that GfK is an employer within the meaning of the FLSA, and thus, no MMWL claim lies.

Accordingly, GfK is entitled to summary judgment on all claims.

1

## STATEMENT OF FACTS[1]

### *Background on GfK*

GfK Group is one of the world's largest market research organizations.  (56.1 at ¶ 1).  GfK Custom Research North America, part of GfK Group's North America Consumer Experiences division, is divided into various sectors.  (*Id*. at ¶ 2-4).  Plaintiff was employed by GfK Automotive in the Product Management Group.  (*Id.* at ¶ 21).

### *GfK Automotive's Image Barometer Study*

During Plaintiff's employment, GfK Automotive's "main" market research product was the Automotive Purchase Funnel, which was later replaced by the "Path to Purchase."  (*Id.* at ¶ 6).  Both the Automotive Purchase Funnel and the Path to Purchase consisted of an "upper funnel," also known as the Image Barometer Study ("Image"), and the "lower funnel," also known the Intentions Study.  (*Id*.).

The Intentions Study identified individuals who intended to buy a new vehicle ("new vehicle intenders").  (*Id*. at ¶ 7).  The Image study "measure[d] new vehicle intender, awareness, opinion, consideration, and imagery" on a vehicle, or the "brand or make" an individual is intending to purchase, as well as "related models or brands, slash, makes."  (*Id*. at ¶ 8).  Between January 2009 and October 2012, this study included "data for 40-60 brand/product segments relieved monthly & quarterly."  (*Id*.).

### *Background on Plaintiff's Education and Employment History Prior to GfK*

Plaintiff obtained a Bachelors of Business Administration ("BBA") from Eastern Michigan University in 2003.  (*Id*. at ¶ 10).  In 1998, she worked at CMI International, Inc., a Tier 2 automotive manufacturer, where she developed substantive knowledge about the

---

[1] The facts detailed herein are accepted as true only for purposes of this motion for summary judgment.  A complete recitation of the undisputed material facts is set forth in Defendant's Local Rule 56.1 Statement of Undisputed Material Facts ("56.1").

automotive industry.  (*Id.* at ¶ 11).  From 1998 to 2007, Plaintiff worked at Second to None, Inc., a "mystery shopping company."  (*Id.* at ¶ 12-15).  Plaintiff spent the last three years of her employment at Second to None in operations management.  (*Id.* at ¶ 13-14).

### Plaintiff's Application to GfK

On or around August 12, 2007, Plaintiff applied for a Research Manager position with GfK using a job search website.  (*Id.* at ¶ 17).  Over multiple days, Plaintiff was interviewed by Julie Kenar ("Kenar"), who would be her direct manager, Penni Howard, whom she would be replacing, Don DeVeaux ("DeVeaux"), Managing Director of GfK Automotive, and Alan Czarnomski ("Czarnomski"), Executive Vice President of GfK Automotive.  (*Id.* at ¶ 19).  She was offered the Research Manager position by DeVeaux over the telephone.  (*Id.* at ¶ 20).

### Plaintiff's Roles

Plaintiff began her employment as a Research Manager in GfK Automotive's Product Management Group in September 2007.  (*Id.* at ¶ 21).  The Product Management Group, also referred to as PMG, performs "operations" functions and is responsible for "coordinating the automotive market research."  (*Id.* at ¶ 22).  The Product Management Group, and Plaintiff in particular, was "not typically involved in the design of the surveys or report analysis, in producing the reports."  (*Id.* at ¶ 48).

From the outset of Plaintiff's employment until March 22, 2010, Plaintiff reported to Kenar, the Vice President of the Product Management Group.  (*Id.* at ¶ 23).  On March 22, 2010, Brian Etchells ("Etchells"), Senior Research Director, became Plaintiff's direct supervisor.  (*Id.*).

On July 4, 2011, Plaintiff was promoted to Senior Research Manager, after working toward the promotion for several months.  (*Id.* at ¶ 24-26).  DeVeaux announced the promotion in a July 14, 2011 email as follows:

Julie Grupke ... to Sr. Research Manager

Julie joined GfK in September 2007 with responsibility for auditing monthly and quarterly Lower Funnel reports. She quickly made great strides in streamlining the audit process and was able to significantly reduce the amount of time it took to get data into client teams' hands. She also played an integral role in developing our first web portal. In 2009, she became responsible for the Image Barometer program.

Over the past few years, Julie has broadened her role and contributions with respect to not only her oversight of the Image Barometer program, but also the management of the portal, client database, and most recently WNS (our India offshore partner). Additionally, Julie has been responsible for resolving several complex business issues on Image which have resulted in a streamlined, more efficient and cost-effective process. These include aligning our segments, revising the decision criteria for assigning vehicles to segments, and revising and simplifying our quota structure. Furthermore, she has been a champion of "value-added" change for GfK- whether it's improving timing, cost, quality, or just the delivery of our data externally or internally.

(*Id*. at ¶ 25). Plaintiff held the position of Senior Research Manager until her employment with GfK was terminated on October 4, 2012. (*Id*. at ¶ 26).

### *Selected Terms and Conditions of Plaintiff's Employment*

Plaintiff worked in GfK's office located in Southfield, Michigan. (*Id*. at ¶ 27). Her starting salary as a Research Manager was $49,000 dollars, or a biweekly salary of $1,885.00. (*Id*. at ¶ 28). She received multiple raises over the course of her employment, and, by July 2012, Plaintiff was earning $59,578.00 per year. (*Id*.). Setting aside raises and bonuses, throughout her employment, Plaintiff received the same amount every pay period regardless of the number of hours worked, except for one two-week period in which she took unpaid time off. (*Id*. at ¶ 29).

### *Overview of Plaintiff's Job Responsibilities*

Plaintiff's resume, which she prepared in or around November 2012, accurately reflects her skills, abilities and work experience. (*Id*. at ¶ 31). Therein, Plaintiff describes herself as a "[s]elf-reliant, efficient, and technically skilled project manager known for innovative problem-

4

solving and process improvement" and "[w]ell-versed in all aspects of project management, including budget & forecasting, issue resolution, vendor coordination, resource allocation, and client pricing." (*Id*. at ¶ 33). These descriptions apply to her work at GfK, as do the following "key skills" listed on her resume:

- Managing large-scale, multi-million dollar tracking studies
- Balancing multiple studies & projects simultaneously
- Improvement of operations-side processes, from documentation to automation
- Vendor relationship management & quality improvement
- Strong presentation skills, focused on framing research issues/changes for organization approval
- Innovative problem-solving, including 'best practices' recommendations
- Passionate about advancing technology and its benefits to an organization
- Research & software management allows me to bridge the gap between business professionals and application developers

(*Id*. at ¶ 34).

As both a Research Manager and Senior Research Manager, one of Plaintiff's primary duties was managing the Image study. (*Id*. at ¶ 35). Plaintiff devoted approximately 80% of her time as a Research Manager and 50% of her time as Senior Research Manger to the Image Study. (*Id*. at ¶ 35-36).

### *Plaintiff's Decision-Making Process*

Plaintiff's "job responsibility was to give recommendations in multiple circumstances and then present to upper management or the affected consulting teams for them to make the final decision." (*Id*. at ¶ 39). Plaintiff had a specific process she followed "for the majority of the time for any decision making." (*Id*. at ¶ 40). "[I]f there was a topic or decision to be made," her "general standard procedure" was as follows:

It would typically be researching the particular issue or topic, formulating a list of options for change or improvement or whatever the topic may be, making a

recommendation or multiple recommendations and then presenting that information typically in a PowerPoint presentation to either senior management, the affected consulting teams or sometimes the entire organization.

**

Then I would have to record – collect their feedback and record the decision that was made.

(*Id*.).  Plaintiff was also responsible for implementing the decision that resulted from the decision-making process.  (*Id*. at ¶ 41).

Plaintiff was required to utilize this decision-making process "frequently."  (*Id*. at ¶ 42). The amount of time Plaintiff devoted to decision-making did not depend on whether she was in the Research Manager or Senior Research Manager position; rather, it depended on what was going on in a particular week and whether there was a desire for "big changes" that would increase the demand for Plaintiff's time.  (*Id*. at ¶ 42).

Plaintiff utilized her decision-making process in decisions to be made by the automotive group and the senior management group.  (*Id*. at ¶ 43).  There are "so many examples" of when she followed this process, including, but not limited to, "any change to the survey or a process, whether it's internal or something that affects deliverables to how a vendor does things," data issue resolution in the Image study, survey and questionnaire design, developing the Image Planning Process Commandments, IT projects, and *ad hoc* surveys.  (*Id*. at ¶ 44, 65, 101).

### Plaintiff's Management of Automotive Studies

As a Research Manager, Plaintiff was responsible for managing research projects on a day-to-day basis and ensuring quality of "the products produced."  (*Id*. at ¶ 45).  In general, Plaintiff provided day-to-day management of research projects, ensured the quality of the data, tested the quality of data collection and sample screening instruments, monitored study performance in terms of schedule, quality and costs, monitored data collection procedures/instruments, and communicated study progress to account executives.  (*Id*. at ¶ 46).

She also formulated recommendations on questionnaire and survey items and survey design, made "informational presentations" at weekly staff meetings "four or five times a year" on topics selected by her managers or herself, and researched issues or anomalies as requested by project teams and identified on her own.  (*Id*.).

As a Senior Research Manager, Plaintiff was responsible for "managing all aspects of Image Barometer, Automotive Environmental, and Leader in Engine Technology studies."  (*Id*. at ¶ 47).  With respect to these three surveys, in general, Plaintiff "coordinated production for study planning to data delivery, including budget & forecast, vendor management, internal resource management, and data issue resolution."  (*Id*.).

One of Plaintiff's goals was "to decrease the amount of time it took to turn around a survey and get it out."  (*Id*. at ¶ 49).  Increasing efficiency and speeding up the process was "a major demand" to Plaintiff from the client teams and management.  (*Id*.).

### *Plaintiff's Management of the Image Study*

In or around late 2008, Plaintiff became responsible for the Image study.  (*Id*. at ¶ 50). Between January 2009 and October 2012, Plaintiff managed all aspects of this multi-million dollar study.  (*Id*.).  Although the "prior project manager for Image held the position of Senior Research Manager," Plaintiff agreed to initially take on the project "without an official change in [her] position title/level."  (*Id*. at ¶ 51).

### *Plaintiff's Management of the Quarterly Image Planning Process*

The Image study was updated through a quarterly planning process, which was managed by Plaintiff.  (*Id*. at ¶ 52).  Plaintiff maintained the Quarterly Code Summary, a document that included "proposed decisions for that particular quarter and the – who proposed it, the details of the change, and what the decision made by the management team and the client teams, what that

decision was." (*Id.* at ¶ 53). Plaintiff was responsible for "creating and distributing preliminary changes and topics," which included "potential changes due to market events or prior requests." (*Id.*).

On a quarterly basis, Pre-Planning Meetings were held with each of the four consulting teams to review the Quarterly Code Summary and the segments of the Image study that each team's clients purchased. (*Id.* at ¶ 54). Plaintiff ran Pre-Planning Meetings either with Etchells or by herself. (*Id.*). After the Pre-Planning Meetings, Plaintiff incorporated feedback from the consulting teams into the Quarterly Code Summary and distributed it for their review in advance of the Quarterly Image Planning Meetings. (*Id.* at ¶ 55). The purpose of the Quarterly Image Planning meetings was to reach "final decisions… on changes to the survey or changes to the content … of the survey." (*Id.* at ¶ 56). Plaintiff's "main goal" in these meetings was to "facilitate or coordinate the decision-making process" and "coordinate everything." (*Id.* at ¶ 57). She also made presentations on a "topic of interest." (*Id.*).

Plaintiff was also responsible for "work[ing] with client teams and outlin[ing] solutions for special client circumstances (e.g. how to accommodate change approval delays, last minute seg[ment]/vehicle additions, etc.)" and "find[ing] creative solutions for custom client requests, considering client needs and vendor deadlines." (*Id.* at ¶ 59).

***Plaintiff's Development of the Image Planning Process Commandments***

In May 2011, Plaintiff drafted the Image Planning Process Commandments, which was "intended to be an outline … of the actual planning process, both for the product management department and for the consultant teams." (*Id.* at ¶ 60). DeVeaux asked her to undertake this assignment. (*Id.* at ¶ 61). She "was tasked with gathering the information… compiling everything, putting it into a PowerPoint presentation, offering the problems and the options to the

management team and then getting agreement from all of them that this is the decision they wanted to make and they wanted to commit to this process." (*Id*. at ¶ 62). She gathered input from DeVeaux and other management parties and "talk[ed] to each of the consulting teams about what Don's concerns were and various ideas that he had mentioned about how to improve the process and getting their input on those ideas." (*Id*. at ¶ 63). Plaintiff also made "some recommendations on the timeline" for the Image Planning process. (*Id*. at ¶ 64).

Plaintiff presented the Image Planning Process Commandments at a Quarterly Image Planning meeting in May 2011. (*Id*. at ¶ 66). Her presentation explained the rationale for having "an official Image Planning process" and the timeline and objectives for each step in the process. (*Id*.). Plaintiff was responsible for "getting agreement" on the process, which she achieved. (*Id*. at ¶ 67).

### Plaintiff's Management of the Image PCR Process

Plaintiff was also responsible for managing the product (or process) change request process ("PCR process") for the Image Study. (*Id*. at ¶ 68). Plaintiff defined her role in this regard as follows:

> Manage all aspects of Image PCRs - create/refine presentation of topics & supporting materials, especially when serving as the PMG contact for a PCR that originates with a consultant/VP; collect costs, outline/refine options + pros & cons, make recommendations; confirm that all PCR requestors follow new PCR process defined in 2009.

(*Id*.). In connection with this role, in 2009, Plaintiff drafted and implemented official Image Commandments, which covers the PCR process, "to serve as ongoing reference & training documentation on the details/nuances of the US Image study." (*Id*. at ¶ 69). DeVeaux, Czarnomski and Kenar wanted the Commandments to serve as the "official record of processes" to be referenced in any future debates over any particular process. (*Id*.).

To create the Image Commandments, Plaintiff had "several meetings" with DeVeaux, Czarnomski and Kenar, where they "basically went through various processes and tried to put it all paper." (*Id*. at ¶ 70). She was not given a list of rules to include. (*Id*.). Rather, she "researched and explained [the] issues to the organization, including doing the leg-work, organizing the issues, results and options in an easy- to-follow format, and presenting to the organization for feedback and resolution." (*Id*. at ¶ 71).

It was Plaintiff's job to "remind the client teams of the rules or processes that they had agreed to." (*Id*. at ¶ 72). This was a "difficult" task that Plaintiff and Etchells described as "herding the cats." (*Id*.).

### *Overview of Operations-Side Improvements to Image Study*

Plaintiff was responsible for various "operations-side" process improvements on the Image study. (*Id*. at ¶ 73). Her resume lists certain fiscal and operational achievements, such as: "reduced budget by $250,000," "increase[ed] annual revenue by $200,000," "reduced processing timeline by 25%," "simplified sampling without affecting data integrity, resulting in 25% efficiency increase and a 10% cost reduction." (*Id*.).

Plaintiff was also responsible for certain "above & beyond" contributions, such as:

- Worked with field vendor and Paul LaMontagne (field PM) to streamline raw data delivery- moved to 'rolling' close (i.e. what can be closed each day), targeting priority segments first and sending raw data to DP vendor in batches based on priority & availability.

  \*\*\*

- Upgraded schedule by standardizing and formalizing process for prioritization- syndicated brand segments first, KAMs determine top priority for first 5-10 model & custom segments, then remainder based on number of buyers

  \*\*\*

- Image I2 Analysis- revisiting attribute list changes made in 2008, gauging projected vs. actual data impact (with Nicole Kasab's help on statistical

10

analysis) presenting results to organization, recommending & implementing suggested changes

- Completed audit of syndicated segment content in LF vs. UF- identified disconnects, researched cause, & made recommendations for changes to align the two funnel halves as much as logically possible

- Updated syndicated segmentation by creating 2 new segments from an existing segment as the market increased (Small-Entry to Small Cars & Entry Cars)- coordinated all aspects from discovery to roll-out, including data impact, costs, pricing, client concerns and presenting all to organization, and creating client marketing deck

- Streamlined Image quota structure to enable more efficient field collection and DP while maintaining integrity of Image data

(*Id*. at ¶ 74).

As with her work on the Image Commandments, Plaintiff characterized the "image quota reduction/simplification" and "I2 analysis" as examples of her "researching & explaining a variety of issues to the organization…" (*Id*. at ¶ 75). With respect to the Image quota reduction, Plaintiff formulated recommendations "to make the quota structure less complex" and "reduce the vendor cost for fielding the survey." (*Id*. at ¶ 76). After multiple meetings with management, the "outcome was a 75% reduction with full support of mngt [sic]." (*Id*.). After the decisions were finalized, Plaintiff drafted and presented a PowerPoint presentation that, among other things, explained the "current image structure," "identif[ied] areas for improvement," and discussed five "recommended changes" that had been approved. (*Id*.). The quota reduction increased efficiency for GfK by reducing "turnaround time" for the field vendor and processing vendor." (*Id*.).

The I2 analysis was a "pretty involved" project in which Plaintiff worked with Nicole Kasab Wiebe ("Wiebe"), an employee from the marketing sciences department, to determine whether certain changes that had been made to attributes in the study "had the impact that [GfK] expected … a couple of years after the changes had been made ... [for] four or five segments."

11

(*Id*. at ¶ 77).  A "core goal of the project" was to "see if there were any redundancies that could be removed from the Image attribute list." (*Id*.).  Plaintiff's role was "helping to coordinate the data analysis itself … [Weibe] focused on … running the statistical side, and then [Weibe and Plaintiff] worked together on interpreting it." (*Id*.).  Plaintiff made "too many [recommendations] to remember." (*Id*.).

In her 2010 review, Plaintiff was commended by Etchells for not only documenting "processing and data processing for Image," but improving them.  (*Id*. at ¶ 78).  In connection with her promotion to Senior Research Manager, DeVeaux credited Plaintiff with "resolving several complex business issues on Image which have resulted in a streamlined, more efficient and cost-effective process." (*Id*. at ¶ 79).

### *Auditing and Investigating Data:*

GfK utilized outside vendors to collect and process data for the Image study and various other studies. (*Id*. at ¶ 80).  Plaintiff's duties included quality checking the processed data to determine if the new data fit into existing trends, "researching and analyzing anomalies," and approving data to be released.  (*Id*. at ¶ 81-85).  Plaintiff investigated anomalies in multiple ways, including looking for changes in the sample, investigating online, or investigating internally with a consultant. (*Id*. at ¶ 84).  Plaintiff researched market data, such as the release, discontinuation or revision of certain model, as well, to assess the data trends. (*Id*. at ¶ 84).  If Plaintiff decided that data fit into an existing trend and/or the anomalies could be explained by "logical terms or market activity," she did not need approval to release the data.  (*Id*. at ¶ 85).  She often released data while she was working at home, at night or over the weekends.  (*Id*.).

Plaintiff also researched data issues and questions as requested by "senior managers," at times in "emergency" situations.  (*Id*. at ¶ 86).  She provided explanations to "affected consulting

teams" on her research on anomalies and analytical insights on data changes. (*Id.* at ¶ 87). For example, in a January 12, 2011 email to the automotive analysts group, Plaintiff identified data changes she had noted in the "SPORTY segment" – "an increase in attribute means for all models and nearly all attributes for these models." (*Id.* at ¶ 89). She explained her investigation of the increase, such as, "verify[ing] the data was collected, stored, exported and processed correctly, using the correct layout, list of vehicles rated, and attributes (all in the correct order)" and determining "there [were] no big differences in straight-lining incidence." (*Id.*). She also identified changes in the sample makeup and market events that could explain the data changes she noted. (*Id.*).

### *Data Issue Resolution*

Plaintiff was responsible for "data issue resolution," which required the following steps:

- Identify problem; cause analysis; outline solution options & pros/cons, present to org with recommendations
- Communicate issue & impact/timeline internally; provide regular updates as needed
- Implement chosen solution internally & with vendors
- Document issue/solution as well as the long-term solution (e.g. internal process change, vendor upgrade, etc.)

(*Id.* at ¶ 90-91). One significant example occurred in 2010, when plaintiff identified a "major issue… too many intenders in [attribute] rating sample." (*Id.* at ¶ 92).

### *Pricing:*

Plaintiff made recommendations on pricing for "too many [studies] to recall," including the Image study and custom reports and studies. (*Id.* at ¶ 93). Although she received "real general guidelines" to follow, there was "an art" to pricing, which, among other things, included "figuring out the direct cost," considering the "target range for the profit margin," "prior purchases," especially purchases by same client or for similar custom projects, and "the margin

itself." (*Id*. at ¶ 94-97).

Plaintiff also worked with Etchells "to improve [the] syndicated price book, including usability and content." (*Id*. at ¶ 97). This included "suggesting pricing & reasons why, working toward leveling out the off-cycle & on-cycle pricing, and taking steps to streamline and improve the price book." (*Id*.). Additionally, she "developed client pricing and researched revenue implications, presented to organization multiple times to collect feedback & client interest, delivered 'ready to sell' solution to client teams." (*Id*.).

### Ad Hoc Projects

Ad hoc surveys and studies are "one-off studies." (*Id*. at ¶ 98). A few "general examples" of when Plaintiff would assist with ad hoc surveys when there was "a problem, a custom survey, or a new product survey." (*Id*. at ¶ 99). One specific example was "a power sports study" that had "issues with the data production and with the capabilities of the project manager assigned." (*Id*. at ¶ 100). Plaintiff "came in to help out, fix the issues, resolve concerns with the survey and, sort of, finish up the production so it could be delivered to the client. (*Id*.). She had to identify the possible issues, make recommendations and work with the account lead on resolutions. (*Id*. at ¶ 101). She was "problem solving" and applied her standard decision-making process. (*Id*.). The power sports study was one of "multiple times in 2011" where she was "brought into assist with an 'unruly' project." (*Id*. at ¶ 102).

### Budgeting and Forecasting

Plaintiff was responsible for drafting a budget for any projects she was the "primary research manager for," which included the Image Study, the Environmental study and the Leader in Technology study. (*Id*. at ¶ 103). Among other things, Plaintiff succeeded in reducing the Image budget and was "regularly at or under budget." (*Id*. at ¶ 104). She was also responsible

for forecasting for these studies, and, in 2009, she reduced the Image forecast by $350,000 through "more accurate/detailed/researched estimates, some methodology and efficiency changes." (*Id*. at ¶ 105).

Plaintiff also prepared budgets for IT projects. (*Id*. at ¶ 106). For example, on October 13, 2011, Plaintiff sent Etchells an email with a budget and details on "three known projects" for 2012. (*Id*.). This included $30,000 for the stat pack project in January, $15,000 for "SQL and server tools upgrade" in March, and $20,000 for "Octopus Dashboards" in April. (*Id*.). Etchells advised Plaintiff over email that DeVeaux approved the costs. (*Id*.).

### *Vendor Management*

Plaintiff was responsible for managing data processing vendors involved in the Image Barometer Study, the Automotive Environmental annual study and the Leader in Technology Study. (*Id*. at ¶ 107). It was typical for Plaintiff to communicate with the vendors, and, at times, she made requests for specific work. (*Id*. at ¶ 108). In such situations, Plaintiff received an invoice after the requested work was completed. (*Id*.). Plaintiff also sought out her own contacts as potential vendors. (*Id*. at ¶109). For example, she suggested a new vendor for the Environmental study, which resulted in a cost reduction. (*Id*. at ¶ 110).

### *Resource Management*

Plaintiff was responsible for managing WNS, an offshore resource, for the product management group and client teams. (*Id*. at ¶ 111). This responsibility included forecasting PMG and client team needs, supervising WNS's production of deliverables and client team reports and presentation, and overseeing support tasks such as budgeting, resource planning and IT support. (*Id*. at ¶ 112). She was also responsible for "internal resource management." (*Id*. at ¶ 113). If additional staff was required on a particular task, Plaintiff requested management

approval, communicated task instructions, priorities & due dates, and helped with troubleshooting issues and scheduling.  (*Id*.).

### *Plaintiff's Management of IT Projects*

Plaintiff became involved in various IT tasks after another employee left the company. (*Id*. at ¶ 114).  These responsibilities "typically fell in [her] lap" because a lot of the tasks "were related to the Image Barometer."  (*Id*.).  She learned how to use various programs during her employment, through a combination of training and teaching herself, to perform her IT duties. (*Id*. at ¶ 115).  Plaintiff provided consultation on the IT implications of many proposed projects and was involved in "planning for the future IT needs of the company" and "budgeting for the future IT needs of the company."  (*Id*. at ¶ 116-117).

### *Stat Pack*

Plaintiff was the project manager for "Stat Pack," a client deliverable that provides a visual representation of statistical analysis run for specific segments of the Image study.  (*Id*. at ¶ 118-119).  She collected input from consulting teams and management and submitted and got approval on a budget.  (*Id*. at ¶ 119).  She drafted the "Stat Pack Program Overview and Summary of Requirements," which included an overview of the current program and its functionality, identified issues with the current program, and presented general and specific needs for program enhancements.  (*Id*. at ¶ 120-121).  She made a recommendation for an IT vendor for this project, which was approved.  (*Id*. at ¶ 121).  Plaintiff was also responsible managing off-shore resources that produced the Stat Pack content.  (*Id*. at ¶ 122).

### *Client Portal*

Plaintiff was the administrator for GfK Automotive's Client Portal, where client deliverables are posted.  (*Id*. at ¶ 123).  She "worked in tandem with IT applications" to solve

16

issues and pre-plan for improvements, oversee content, functionality and security, maintain use accounts, provide user-end support and troubleshooting and oversee site upgrades. (*Id*. at ¶ 124-125). In addition, on behalf of GfK Automotive's Product Management Group, Plaintiff entered into an annual agreement with IT Apps "regarding support for the automotive client portal." (*Id*. at ¶ 126). Among other things, the agreement committed the Product Management Group to pay monthly fee of $1222 to IT Apps for various fees, maintenance and support. (*Id*.).

## ARGUMENT

## I.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where there are no genuine disputes concerning any material facts, and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c). It should be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex v. Catrett*, 477 U.S. 317, 322 (1986). A party opposing summary judgment must provide admissible evidence and "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible." *Gan v. City of N.Y.*, 996 F.2d 522, 532 (2d Cir. 1993). Further, the non-movant must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. v. Zenith*, 475 U.S. 574, 586 (1986). She must "offer[ ] any concrete evidence from which a reasonable juror could return a verdict in [her] favor." *Anderson v. Liberty Lobby*, 477 U.S. 242, 256 (1986).

In considering a motion for summary judgment, the issue for the court is "not whether [it] thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Liberty Lobby*, 477 U.S. at

252; s*ee also Broich v. Inc. Vill. of Southampton*, 2011 U.S. Dist. LEXIS 6954, at *15 (E.D.N.Y. Jan. 25, 2011) ("Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.")  (citing *Ricci v. DeStefano*, 557 U.S. 557, 129 S. Ct. 2658, 2677, 174 L. Ed. 2d 490, 511 (2009)).

Courts have found summary judgment to be an appropriate tool for deciding misclassification claims under the FLSA. *See, e.g., Krumholz v. Vill. of Northport,* 873 F. Supp. 2d 481, 487 (S.D.N.Y. 2012) ("It is a strict question of law whether the activities and responsibilities of the employee, once established, exempt him or her from the FLSA's overtime requirements.").

## II.   PLAINTIFF WAS AN EXEMPT ADMINISTRATIVE EMPLOYEE UNDER THE FLSA

The FLSA requires employers to pay overtime for "employment in excess of [forty hours per week] at a rate not less than one and one-half times the regular rate at which [the employee] is employed." 29 U.S.C. § 207(a)(1).[2]  However, certain employees are exempt from the overtime requirements, including "any employee employed in a bona fide ... administrative ... capacity." 29 U.S.C. § 213(a)(1).   Under the Department of Labor ("DOL") regulations, to qualify as an exempt administrative employee, an employee must (1) be compensated on a salary or fee basis at a rate of not less than $455 per week; (2) have a primary duty of performing office or non-manual work directly related to the management or general business operations of the employer; and (3) have a primary duty that includes the exercise of discretion and independent judgment with respect to matters of significance. 29 C.F.R. § 541.200(a).   As set forth below,

---

[2] The statute of limitations under the FLSA is two years.  29 U.S.C. § 255(a).  However, if the plaintiff can establish that the cause of action arose out of a "willful" violation, the statute of limitations may be extended to three years. *Id.*  Even if Plaintiff could establish that a violation occurred, which she cannot, she will be unable to establish that any such violation was willful.  Nonetheless, for the purpose of this motion only, we consider Plaintiff's duties over the three-year statute of limitations period.

18

Plaintiff's employment with GfK satisfies all three prongs of this test, and she was, therefore, properly classified as an exempt administrative employee.

### A.      Plaintiff's Pay Satisfied the Salary Requirement

The first prong of the administrative exemption test requires that an employee earn at least $455 dollars per week on a salary basis.  It is undisputed that Plaintiff was paid on a salary basis that exceeded this threshold throughout her employment with GfK.

### B.      Plaintiff's Primary Duty was Administrative Work

The second prong of the administrative exemption test requires that an employee have a primary duty[3] of "the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers."  29 C.F.R. § 541.200(a)(2).  To meet this requirement, "an employee must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment."  29 C.F.R. § 541.201(a).  "Work in functional areas such as… finance, budgeting… auditing… quality control, purchasing, procurement ... research … computer network, internet and database administration" is directly related to management or general business operations.  29 C.F.R. § 541.201(b).

Plaintiff's job duties at GfK clearly satisfy the second prong of the test.  GfK is in the business of market research, and Plaintiff's primary duty was the management of various market research studies -- the very heart of GfK's business operations.  In fact, Plaintiff herself, who obtained a BBA and worked in operations for three years prior to GfK, characterized the Product Management Group as operations – and not production.   In her resume, Plaintiff touted

---

[3] The DOL regulations define "primary duty" as the "principal, main, major, or most important duty that the employee performs."  29 C.F.R. § 541.700(a).

"improvement of operations-side processes" and "vendor relationship management & quality improvement" as key skills" utilized in her employment with GfK.  She also described various fiscal and operational achievements such as reducing budgets, costs and timelines, and increasing revenue and efficiency.  Such functions *alone* are sufficient to establish that Plaintiff's duties "relate[d] directly to the management and general business operations of [GfK]."  *Krumholz,* 873 F. Supp. 2d at 489 (E.D.N.Y. 2012) (second prong of the administrative exemption test where plaintiff, who had a BBA, was responsible for supervising and drafting budget, deciding where to invest excess money, operating bank accounts, and signing checks); *see also Alberti v. Cnty. of Nassau,* 393 F. Supp. 2d 151, 174-75 (E.D.N.Y. 2005) ("responsibility for reviewing the reasonableness of various proposed expenditures, directly related to the management policies or general business operations of Nassau County, and clearly demanded the exercise of discretion and judgment").

However, Plaintiff's role as the project manager for various studies required far more than preparing budgets and procuring services from vendors and internal resources.  Her duties also included, among other things, auditing and analyzing survey data for quality assurance, researching and presenting various issues to management and client teams, pricing, and administering the client portal.  Her work in these functional areas falls squarely within the examples provided by the DOL.  *See* 29 C.F.R. § 541.201(b); *see also Krause v. Merrill Lynch,* 2011 U.S. Dist. LEXIS 40397, at *17 (S.D.N.Y. Apr. 13, 2011) ("responding directly to client research requests, creating investment summaries, and coordinating and participating in, among other things, client events, meetings and conferences" are directly related to assisting with the running or servicing of the business); *O'Neill v. Omni Hotels Mgmt Corp.,* 2001 U.S. Dist. LEXIS 2138, *25 (S.D.N.Y. Mar. 2, 2001) (participation in management meetings and budget

forecasting was administrative work that serviced the business).

As project manager for the Image study, Plaintiff managed all aspects of this multi-million dollar study.  In addition to the standard duties listed above, Plaintiff's duties with respect to the Image study also included managing the quarterly Image Planning Process and the Image PCR process.  Her role in this regard required coordinating and leading meetings, organizing and presenting information, and making recommendations.  Plaintiff also researched, drafted and presented the official rules for both the planning process (*i.e.,* the Image Planning Process Commandments) and the PCR process (*i.e..* the Image Commandments) to client teams and management, and she undertook the challenging task of managing compliance with those rules.  Without question, Plaintiff's role in this regard is administrative.  *See Scarpinato v. East Hampton Point Mgmt. Corp.,* 2013 U.S. Dist. LEXIS 131338, at *6 (E.D.N.Y. Sept. 13, 2013) (adopting magistrate's recommendation and granting summary judgment where plaintiff held and performed "managerial duties" like booking events); *Raffe v. Am. Nat'l Red Cross,* 2011 U.S. Dist. LEXIS 137340, at *31-35 (N.D.N.Y. Nov. 20, 2011) (plaintiff's management and monitoring of emergency services, which included overseeing operations and formulating operation and emergency response policies, was directly related to management or general business operations); *O'Neill*, 2001 U.S. Dist. LEXIS 2138 at *25 (compiling Hotel's manual on conference services was exempt administrative work).

Because Plaintiff's "myriad duties go significantly further than merely producing [GfK's] services for its customers," the second prong of the administrative exemption test is met.  *Raffe*, 2011 U.S. Dist. LEXIS 137340 at *34.

### C.    Plaintiff's Primary Duty Required the Exercise of Discretion and Independent Judgment

The third prong of the administrative exemption test requires that "an employee's

primary duty must include the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200. The DOL regulations explain that, "[i]n general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible course of conduct, and acting or making a decision after the various possibilities have been considered." 29 C.F.R. §541.202(a). Importantly, although "the exercise of discretion and independent judgment implies that the employee has authority to make an independent choice, free from immediate direction or supervision… employees can exercise discretion and independent judgment even if their decisions or recommendations are reviewed at a higher level." 29 C.F.R. § 541.202(c). Plaintiff's own testimony demonstrates that she exercised discretion and independent judgment sufficient to meet this standard. Indeed, she conceded her "job responsibility was to give recommendations in multiple circumstances and then present to upper management or the affected consulting teams for them to make the final decision." She "frequently" followed her "decision-making process," which involved researching the issue, formulating a list of options, and making and presenting recommendations. "The fact that [her] decisions and recommendations frequently required supervisor approval [do not] render her actions non-discretionary." *Klein v. Torrey Point Group, LLC*, 2013 U.S. Dis. LEXIS 152875, at *21 (S.D.N.Y. Oct. 23, 2013).

The DOL regulations also provide a non-exhaustive list of factors to analyze the scope of judgment exercised by employee.[4] "[C]ourts have often found that a given employee exercised

---

[4] "Factors to consider when determining whether an employee exercises discretion and independent judgment with respect to matters of significance include, but are not limited to: whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; whether the employee has authority to commit the employer in matters that have significant financial impact; whether the employee has authority to waive or deviate from established policies and procedures without prior approval; whether the  employee has authority to negotiate and bind the company on significant

22

discretion and independent judgment sufficient to satisfy the requirement even when only a few of the factors were met." *Id*. at *20. In this case, Plaintiff's work satisfies at least seven of these factors: (1) Plaintiff formulated, affected, interpreted, and implemented management policies or operating practices in her pricing recommendations and in the development and implementation of the Image Commandments and the Image Planning Process Commandments; (2) Plaintiff's management of various studies, including the multi-million dollar Image study, and her development of the Stat Pack project, were major assignments in the operation of the business; (3) Plaintiff's work on various Image-related projects, such as the Quota Reduction and the I2 analysis, affected business operations to a substantial degree by simplifying and streamlining processes, increasing efficiency and lowering costs; (4) Plaintiff committed the Company to paying for services from IT Apps by entering into the annual Automotive Portal agreement and ordering services directly from vendors which were later invoiced for payment; (5) Plaintiff was involved in planning for and budgeting future IT improvements and undertook various projects with the objective of increasing efficiency for the Image study; (6) Plaintiff "frequently" researched and presented recommendations, such as the Image Commandments, the Quota Reduction, and the I2 Analysis to management and consulting teams, and she was engaged for problem-solving on unruly projects, such as the power sports study; and (7) Plaintiff investigated and explained data issues or questions, at times in emergency situations, at the request of senior management.

In light of the above, it is indisputable that Plaintiff's discretion and independent judgment satisfies the third prong of the administrative exemption. Courts in this Circuit have

---

matters; whether the employee provides consultation or expert advice to management; whether the employee is involved in planning long- or short-term business objectives; whether the employee investigates and resolves matters of significance on behalf of management; and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances." 29 C.F.R. § 541.202(b).

found plaintiffs with far less discretion to be exempt.  *See, e.g., Klein*, 2013 U.S. Dist. LEXIS 152875 at *22 (inside account manager exercised discretion and independent judgment by determining his own schedule and analyzing customer needs); *Scarpinato,* 2013 U.S. Dist. LEXIS 131338 at *6 (plaintiff who planned events and issued checks was an exempt administrative employee).   Accordingly, Plaintiff was properly classified as an exempt administrative employee, and the FLSA claim should be dismissed.

### III.    GFK IS EXEMPT FROM THE OVERTIME PROVISIONS OF THE MMWL

Plaintiff also seeks overtime under the MMWL.  Although the MMWL largely parallels the FLSA, it specifically exempts employers who are otherwise covered by the FLSA.  Section 14(a) of the MMWL provides that the law "does not apply to an employer who is subject to the minimum wage provisions of the Fair Labor Standards Act of 1938…unless application of those federal minimum wage provisions would result in a lower minimum wage than as provided in [the MMWL]." Mich. Comp. Laws § 408.394(1).   In October 2006, Michigan legislature amended the MMWL to provide for a higher state minimum wage than under federal law. Recognizing that this amendment would bring many new employers under the statute only by virtue of the increase in the state minimum wage, the legislature also amended Section 14(a) as follows: "Section 4a [which governs overtime compensation] does not apply" to "an employer who is subject to this act only by application of this subsection [of Section 14]."

"The exemption language plainly states that employers subject to the FLSA are not also subject to the MMWL despite section 14's provision that the exemption does not apply where the 'federal minimum wage provisions would result in a lower minimum wage, even in light of the increase in the state minimum wage.'" *Arrington v. Michigan Bell Tel. Co.,* 746 F. Supp. 2d 854, 857 (E.D. Mich. 2010).  "The natural reading of the text allows for no other conclusion, and no

other statutory interpretation is necessary." *Id*. (dismissing MMWL claim where defendant was covered by the FLSA).  Accordingly, because GfK is covered by the FLSA, it is exempt from the overtime provisions of the MMWL.

## CONCLUSION

For the foregoing reasons, the Court should grant Defendant's motion for summary judgment, dismiss Plaintiff's Complaint in its entirety with prejudice, and grant Defendant such other relief as the Court deems appropriate.


Date:   May 2, 2014
        New York, New York

                                         s/
                          _____
                          Craig R. Benson
                          Meredith L. Kaufman