UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------X
                          :

JULIE GRUPKE,

            *Plaintiff*,

      *-against-*

GFK CUSTOM RESEARCH NORTH
AMERICA,

           *Defendant*.

----------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 1- 28- 15

13 Civ. 913 (PAC)

**OPINION & ORDER**

HONORABLE PAUL A. CROTTY, United States District Judge:

       Plaintiff Julie Grupke ("Plaintiff" or "Grupke"), who worked at GfK Custom Research

North America ("Defendant" or "GfK") from September 2007 until October 2012, brings this

action under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, and the Michigan

Minimum Wage Law of 1964, § 480.381 *et seq.* ("MMWL"), claiming that GfK misclassified

her under the administrative employee exemption to the FLSA, and did not pay her for the

overtime hours she worked.  GfK moves for summary judgment on both of Grupke's claims on

the grounds that it properly classified Grupke as an administrative employee.  The Court agrees

and accordingly grants GfK's motion for summary judgment.

1

**BACKGROUND**[1]

Although the parties draw different legal conclusions from the factual record, the material facts themselves are essentially undisputed.  GfK is a large market research organization, providing research and consulting services to clients. Def. 56.1 Statement ¶¶ 1-2.  Grupke was employed in the Automotive division, which performs automotive market research.  *Id.* ¶¶ 4-6, 21.  During Grupke's employment, the Automotive division operated the Automotive Purchase Funnel study, which consisted of an upper funnel known as the Image Barometer Study, and the lower funnel, known as the Intentions Study.  *Id.* ¶ 6.  These studies measured new vehicle intenders; awareness, opinion, consideration, and imagery of a vehicle; the brand and make an individual intends to purchase; and related models or brands.  *Id.* ¶ 7.

Grupke applied for a Research Manager position at GfK on August 12, 2007, using a job search website.  *Id.* ¶ 17.  She began working at GfK in September 2007, at which point she reported to Julie Kenar, the Vice President of the Product Management Group.  *Id.* ¶¶ 21-23.  On March 22, 2010, Brian Etchells became Grupke's direct supervisor, and she told him she sought a promotion.  *Id.* ¶¶ 23-24.  On July 4, 2011, Grupke was promoted to Senior Research Manager.  *Id.* ¶ 25.  Her promotion was announced to the company in an email which stated that Grupke "quickly made great strides in streamlining the audit process and was able to significantly reduce the amount of time it took to get data into client teams' hands.  She also played an integral role in

---

[1] The facts presented herein are derived from the parties' motions for summary judgment, Defendant's Rule 56.1 Statement, and Plaintiffs' Declaration in Opposition to Defendant's Motion for Summary Judgment.  Although Grupke has submitted a counterstatement of facts, this document does not contradict the evidence provided by GfK or dispute any material fact, nor is it supported by citations to the record, as required.

developing our first web portal." *Id.* This email also refers to her management and oversight of the Image Barometer program and the fact that she was "responsible for resolving several complex business issues on Image . . . includ[ing] aligning our segments, revisiting the decision criteria for assigning vehicles to segments, and revising and simplifying our quota structure." *Id.* Grupke held this position until her termination on October 4, 2012. *Id.*¶ 26.

Grupke's starting salary was $49,000; $1,885.00 biweekly. *Id.* ¶ 28. She received several raises and by July 2012 was earning $59,578.00 per year. *Id.* When she was employed as Research Manager, Grupke devoted approximately 80 percent of her time to managing the Image Study. *Id.* ¶ 35.[2] The remaining 20 percent she spent working on website administration and assistance on ad hoc projects and surveys. *Id.* As Senior Research Manager, 50 percent of Grupke's time was spent managing the Image Study. *Id.* ¶ 36. She spent approximately 5 percent of her time managing an Environmental Study and 5 percent managing a Leader in Technology Study. *Id.* 25 percent of her time was spent on IT project management and 10 percent administering the automotive client portal. *Id.*

One of Grupke's job responsibilities was "to give recommendations in multiple circumstances and then present to upper management or the affected consulting teams for them to make the final decision." *Id.* ¶ 39. She would often be assigned to research a particular topic, draft a list of options, make a recommendation, present that recommendation, and collect feedback and record the decision. *Id.* ¶¶ 40-44. She often used this process when advising not only the automotive group but the senior management group as well. *Id.* ¶ 43. She was responsible for implementing the decision that resulted from the decision-making process.

---

[2] Grupke's resume states, in part, that she is a "technically skilled project manager . . . [who is] well-versed in all aspects of project management." *Id.* ¶ 33.

*Id.* ¶ 41.

Grupke managed research projects on a day-to-day basis and was tasked with ensuring the quality of the products produced. *Id.* ¶ 45. She monitored data collection procedures and screening instruments, monitored study performances, tested data quality, and reported progress to account executives. *Id.* ¶ 46. She made recommendations on survey items and designs, made informal presentations at staff meetings, and researched data anomalies identified by others or discovered on her own. *Id.* Grupke was asked by client, management, and consulting teams to increase efficiency and speed up the amount of time it took to complete a survey. *Id.* ¶ 49.

One of Grupke's tasks was to maintain the Quarterly Code Summary, a planning process that served to update the Image study. *Id.* ¶¶ 52-53. This document included "proposed decisions for that particular quarter and . . . who proposed it, the details of the change, and what that decision made by the management team and the client teams . . . was." *Id.* ¶ 53. Quarterly pre-planning meetings occurred with consulting teams to review the Quarterly Code Summary and segments of the Image study. *Id.* ¶ 54. Grupke conducted these meetings with Etchells or independently. *Id.* After these meetings, Grupke incorporated feedback from the teams into the summary and distributed it. *Id.* ¶ 55. This occurred in advance of the quarterly Image Planning meetings, which were designed to reach a final decision on changes to the survey. *Id.* ¶ 56. In these meetings, Grupke's main goal was to "facilitate or coordinate the decision-making process." *Id.* ¶ 57. She also made presentations on a topic of interest. *Id.* Grupke described these meetings as replete with arguments about proposed changes. *Id.* ¶ 58. She was also responsible for working with client teams and outlining solutions for special client circumstances. *Id.* ¶ 59.

In May 2011, Grupke drafted Image Planning Process Commandments. *Id.* ¶ 60. She
was to gather information from various teams, compile the information, create a PowerPoint
presentation, offer problems and options to the management team, and obtain agreement on
decisions. *Id.* ¶¶ 62-67. She also was responsible for managing the product change request
process for the Image Study. *Id.* ¶ 68. She drafted and implemented official Image
Commandments which were to serve as the "'official record of processes' to be referenced in
any future debates over any particular process." *Id.* ¶ 69. To create these commandments, senior
management instructed Grupke on how she should perform this task, and she researched and
explained issues to the organization and was tasked with reminding client teams that they had
agreed to these rules and processes. *Id.* ¶¶ 70, 72.

Grupke also enabled certain process improvements in the Image Study. *Id.* ¶ 73.[3] She
increased annual revenue, reduced the processing timeline by 25 percent, simplified aspects of
the study, and reduced delivery times for certain segments of the study. *Id.* For example, she
recommended options for simplifying the quota structure and reducing the vendor cost for
fielding the survey. *Id.* ¶ 76. A 2010 performance review describing her work on the Image
study states that she improved processing and data processing; streamlined data checking;
simplified sampling; streamlined deliverable creation; and provided client teams with analytical
insights into data changes. *Id.* ¶ 78.

GfK used outside vendors to collect and process data for certain studies. *Id.* ¶ 80.
Grupke was tasked with quality checking the processed data, researching anomalies, and
approving data to be released. *Id.* ¶¶ 80-81. She also researched market data to assess data

---

[3] In her response to Defendants' 56.1 Statement, Grupke asserts that paragraph 73 is based on her resume "where
she is not likely to give any credit to those achievements to her former superiors." Dkt. 34, ¶ 73. Nonetheless she
does not deny that she claimed these accomplishments on her resume.

trends. *Id.* ¶ 82.  When she decided that data fit into an existing trend or a particular anomaly

could be explained, she released data without approval. *Id.* ¶ 85.  In emergency situations, she

researched data issues and questions as requested by senior managers, for example in a power

sports study that had issues with data production. *Id.* ¶¶ 98-102.  She was often tasked with

assisting on ad hoc surveys and studies. *Id.*  She was responsible for data issue resolution, which

entailed identifying a problem, outlining options for solutions and their pros and cons, presenting

recommendations, communicating the issue internally, implementing the chosen solution, and

documenting the solution. *Id.* ¶¶ 90-92.  She made recommendations on pricing, following set

guidelines but also considering certain variables. *Id.* ¶¶ 93-97.

Grupke also was responsible for drafting budgets for projects on which she was the

primary research manager. *Id.* ¶¶ 103-106.  Drafting the budget involved Grupke providing

estimated costs and hours into a budget document provided by GfK's finance department. *Id.*;

Grupke Decl. ¶ 28.  She also managed data processing vendors and communicated with them

throughout studies, sometimes requesting that they perform specific tasks. Def. 56.1 Statement

¶¶ 107-108.  She was also responsible for managing WNS, an offshore resource for the product

management group and client teams. *Id.* ¶ 111-113.  She was required to supervise WNS's

production of deliverables and client team reports and presentations. *Id.* ¶ 112.  She oversaw

internal resource management, for example communicating instructions and priorities and

troubleshooting issues. *Id.* ¶ 113.

Grupke became involved in IT tasks following another employee's departure and

consulted on IT implications for projects, including estimating future IT budgets. *Id.* ¶¶ 114-

117.  She also managed a project called Stat Pack, which provided clients with a visual

representation of statistical analysis for specific segments of the Image study. *Id.* ¶¶ 118-120.

Grupke served as the contact person on this project. *Id.* ¶ 119. She also administered the GfK

Client Portal where client deliverables were posted, working with IT to solve issues, oversee

content, functionality, and security, maintain accounts, provide user-end support, and oversee

upgrades. *Id.* ¶¶ 123-125.

## DISCUSSION

**I.     Legal Standards**

   **A.  Summary Judgment**

Summary judgment may be granted where "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

R. Civ. P. 56. A fact is material if it "might affect the outcome of the suit under governing law."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party bears the initial

burden of producing evidence on each material element of its claim or defense demonstrating

that it is entitled to relief. *See Celotex v. Catrett*, 477 U.S. 317, 323 (1986).

Once the moving party has made an initial showing that no genuine issue of material fact

remains, the nonmoving party may not refute this showing solely by means of "[c]onclusory

allegations, conjecture, and speculation," *Niagara Mohawk Power Corp. v. Jones Chem., Inc.*,

315 F.3d 171, 175 (2d Cir. 2003) (internal citations and quotations omitted), but must instead

present specific evidence in support of its contentions that there is a genuine dispute as to

material facts. Fed. R. Civ. P. 56(e). The Court resolves all ambiguities and draws all factual

inferences in favor of the nonmovant, but "only if there is a 'genuine' dispute as to those facts."

*Scott v. Harris*, 550 U.S. 372, 380 (2007).

## B. Fair Labor Standards Act

The goal of the FLSA is to eliminate "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers." 29 U.S.C. § 202(a). To that end, the FLSA imposes various wage and hour requirements, including the overtime requirement at issue in the present case. Section 207(a)(1) of the Act provides that "no employer shall employ any of his employees . . . for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed."

The FLSA exempts "any employee employed in a bona fide . . . administrative . . . capacity" from the overtime requirement. 29 U.S.C. § 213(a)(1). The Department of Labor defines an administrative employee as one who earns more than $455 per week and whose primary duties include: (1) "the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers" and (2) "the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a). This exemption must be narrowly construed against the employer seeking to invoke it. *Pippins v. KPMG, LLP*, 759 F.3d 235, 238 (2d Cir. 2014).

In order to meet the first requirement, "an employee must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment." 29 C.F.R. § 541.201(a). The DOL has stated that work related directly to management or general business operations:

8

> includes, but is not limited to, work in functional areas such as
> tax; finance; accounting; budgeting; auditing; insurance; quality
> control; purchasing; procurement; advertising; marketing;
> research; safety and health; personnel management; human
> resources; employee benefits; labor relations; public relations;
> government relations; computer network, internet and database
> administration; legal and regulatory compliance; and similar
> activities.

29 C.F.R. § 541.201(b). "The distinction between administrative work and production work
separates those employees whose primary duty is administering the business affairs of the
enterprise from those whose primary duty is producing the commodity or commodities, whether
goods or services that the enterprise exists to produce and market." *Schwind v. EW & Assocs.,
Inc.*, 357 F. Supp. 2d 691, 705 (S.D.N.Y. 2005) (internal quotation marks and citations omitted).

The DOL defines "the exercise of discretion and independent judgment" as "the
comparison and the evaluation of possible courses of conduct, and acting or making a decision
after the various possibilities have been considered. The term 'matters of significance' refers to
the level of importance or consequence of the work performed." 29 C.F.R. § 541.202(a). In
determining whether an employee meets this requirement, the DOL has provided an extensive,
though not exhaustive, list of "[f]actors to consider":

> whether the employee has authority to formulate, affect, interpret,
> or implement management policies or operating practices; whether
> the employee carries out major assignments in conducting the
> operations of the business; whether the employee performs work
> that affects business operations to a substantial degree, even if the
> employee's assignments are related to operation of a particular
> segment of the business; whether the employee has authority to
> commit the employer in matters that have significant financial
> impact; whether the employee has authority to waive or deviate
> from established policies and procedures without prior approval;
> whether the employee has authority to negotiate and bind the
> company on significant matters; whether the employee is involved

9

> in planning long- or short-term business objectives; whether the
> employee investigates and resolves matters of significance on
> behalf of management; and whether the employee represents the
> company in handling complaints, arbitrating disputes or resolving
> grievances.

*Id.* § 541.202(b). These factors "are illustrative, but neither exclusive or inclusive, and courts

have often found that a given employee exercised discretion and independent judgment sufficient

to satisfy the requirement even when only a few of the factors were met." *Klein v. Torrey Point

Grp., LLC*, 979 F. Supp. 2d 417, 428-29 (S.D.N.Y. 2013).

The DOL has cautioned that the mere "use of skill in applying well-established

techniques, procedures or specific standards described in manuals or other sources" falls short of

discretion and independent judgment. 29 C.F.R. § 541.202(e). Instead, an employee must have

the "authority to make an independent choice, free from immediate direction or supervision" in

order to be exempt. *Id.* § 541.202(c). The employee need not, however, be the final decision-

maker. To the contrary, "[t]he fact that an employee's decision may be subject to review and

that upon occasion the decisions are revised or reversed after review does not mean that the

employee is not exercising discretion and independent judgment." *Id.* § 541.202(c).

## II.     FLSA Claim

GfK contends that Grupke was an exempt administrative employee under the FLSA and

therefore not entitled to overtime wages. Def. Mem. at 18-26. Grupke responds that GfK has

failed to meet its burden of demonstrating that Grupke's primary duty was the performance of

office or non-manual work directly related to the management or general business operations of

GfK, or that Grupke's primary duty included the exercise of discretion and independent

judgment with respect to matters of significance.[4] Pl. Mem. at 5-14. For the following reasons, the Court finds that GfK has demonstrated that Grupke's work meets all required elements of the administrative exemption.

## A. Primary Duty Directly Related to Management or General Business Operations

GfK has successfully demonstrated that Grupke's primary duty was "the performance of . . . work directly related to the management or general business operations of the employer." 29 C.F.R. § 541.200(a)(2). Grupke asserts that her job consisted solely of contributing to GfK's "product"—that is, market research studies.[5] Pl. Mem. at 7-11. The evidence, however, tells a different story.

First, Grupke stated at her deposition that she was placed in the product management group of GfK, which "[a]n outside person may see it as operations." Grupke Dep. 49:2-3. Her admission that she was squarely within an operational branch of GfK belies her claim that she "was not on the 'management' side, but on the 'producing' side." Grupke Decl. ¶ 3. She described the function of the product management group as "coordinating the automotive market research." Grupke Dep. 49:10-11. An employer's "general business operations includes [employees] . . . whose work affects business operations to a substantial degree, even though their assignments are tasks related to operation of a particular segment of the business." *Difilippo v. Barclays Capital, Inc.*, 552 F. Supp. 2d 417, 422 (S.D.N.Y. 2008) (internal quotation marks and citations omitted). Accordingly, that Grupke's work primarily constituted

---

[4] Grupke does not dispute that she meets the salary requirement of an exempt administrative employee.

[5] The Court notes that the parties' semantic dispute regarding whether GfK is "in the business of market research" or "produces market research surveys" is irrelevant. The "administrative/production dichotomy focuses not on whether an employee worked for an enterprise engaged in production activity, but whether the employee's primary duty was producing the product in question." *Cooke v. Gen. Dynamics Corp.*, 993 F. Supp. 56, 61 (D. Conn. 1997).

coordinating research studies and not a broader segment of business operations is irrelevant.

In support of her argument that her primary duty did not constitute managerial or operational work, Grupke relies on *Dalheim v. KDFW-TV*, 918 F.2d 1220 (5th Cir. 1990), and *Reich v. State of New York*, 3 F.3d 581 (2d Cir. 1993). But analogizing her work to the production of criminal investigations and the production of television newscasts does not support her argument. Grupke's employment involved far broader job responsibilities than the facts of those cases presented.

Grupke's duties on the research studies she coordinated included "handling invoices, working on budget, quality checking the data and releasing the data internally." Grupke Decl. ¶¶ 14. It was Grupke's responsibility "to make the study more efficient and accurate and to speed up turning the data into results." *Id.*¶ 17. Grupke's duties and performance included increasing the efficiency of GfK's studies, *id.* ¶ 17, and "compiling the feedback and suggestions from the research and consulting teams and presenting them to management," *id.* ¶ 22. She generally "operated as a hub for the projects that [she] coordinated." *Id.* ¶ 21. In addition, Grupke performed quality control analyses on data, was involved in presenting issues to management and client teams, and assisted clients with a client portal. Grupke admits that it was her job "to present the decision [of senior management] to the staff and oversee its implementation." *Id.* ¶ 26. She also spent time performing tasks related to computer systems and IT.

GfK's evidence establishes that Grupke's primary duty was work related to GfK's management and general business operations. Grupke has failed to overcome this significant showing. Instead of providing evidence to contradict GfK's showing of Grupke's managerial work, Grupke instead emphasizes how all the tasks she performed "followed an established process or w[ere] dictated to me by management." Grupke Decl.¶ 21. Throughout her papers,

Grupke emphasizes that all tasks GfK points to as evidence of Grupke's operational role were assigned to her by higher management. Yet in the majority of employment, an individual's tasks are assigned to them. An assignment of work does not remove an employee from the administrative exemption. Even though Grupke could not choose her tasks and job responsibilities herself, that does not defeat summary judgment. This line of argument "appears as a feeble effort to invoke the oft-cited standard that employees may be exempt, even if they perform managerial tasks, if they do so largely pursuant to the dictates of immutable policy or at the behest of the Manager to whom they report." *Scarpinato v. East Hampton Point Mgmt. Corp.*, 2013 WL 5202656, at \*12 (E.D.N.Y. Sept. 13, 2013) (internal citations and alterations omitted). Here, however, GfK has convincingly shown that Grupke's primary duties were directly related to GfK's general business operations, and Grupke has failed to overcome that showing.

## B. Exercise of Discretion and Independent Judgment

GfK has demonstrated that Grupke's "primary duty include[d] the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(3). It is well-established that "employees can exercise discretion and independent judgment even if their decisions or recommendations are reviewed at a higher level" and that such decisions "may consist of recommendations for action rather than the actual taking of action." *Id.* § 541.202(c).

GfK demonstrates that several of the non-exclusive factors elucidated in 29 C.F.R. § 541.202(b) are satisfied. First, Grupke was frequently asked to interpret and implement management policies. *See, e.g.,* Grupke Decl. ¶ 25 ("It was my job to present to the research teams what management had decided, including drafting and implementing them, and that is what I did."). She carried out major assignments in conducting the operations of the business—

13

as discussed above, she coordinated studies, identified opportunities for improvements, and implemented changes that increased efficiencies. She was involved in planning long and short-term business objectives—she worked on budgeting, long-term IT projects, and improvements to numerous studies. She frequently provided consultation to management in ad hoc situations. One of her primary responsibilities was to present options to management after interfacing with various client teams and implementing chosen solutions. Finally, she investigated and resolved matters of significance on behalf of management, as evidenced by her testimony that she resolved discrete issues with studies on an ad hoc basis and was called on to assist with specific emergency issues in various aspects of the business.

GfK has shown that a large portion of Grupke's responsibilities included accumulating information, making recommendations to senior management, and implementing the chosen approach. *See, e.g.*, Def. 56.1 Statement ¶¶ 39-44, 54-58, 62, 69; Grupke Decl. ¶¶ 15, 22, 24, 26. While Grupke argues that she "did not choose the solution" in these situations, "[t]he fact that Plaintiff's exercise of independent judgment sometimes took the form of recommendations . . . does not diminish her exercise of discretion and judgment." *Savage v. UNITE HERE*, 2008 WL 1790402, at *10 (S.D.N.Y. Apr. 17, 2008). Moreover, there were tasks Grupke could perform without prior approval. An employee who is required to seek approval in certain circumstances or follow certain instructions still satisfies the independent judgment element of the exemption. *See Klein*, 979 F. Supp. 2d at 428-29.

GfK has also demonstrated that Grupke exercised discretion relating to matters of significance. Grupke's responsibilities encompassed planning, coordination, and administration of GfK's main research studies. Both parties agree that GfK's research studies are at the core of its business. "The consequence of Plaintiff's ability to perform her work successfully . . . could

hardly be more significant to Plaintiff's employer." *Savage*, 2008 WL 1790402, at *10.

Considering the facts in the light most favorable to Grupke, she has failed to overcome GfK's showing that Grupke's primary duties directly related to management or general business operations and involved the exercise of discretion and independent judgment on matters of significance. Accordingly, GfK has established that Grupke was properly classified as an exempt administrative employee and that she is not entitled to overtime wages. The Court grants GfK summary judgment on Grupke's FLSA claim.

## III.   MMWL Claim

GfK argues that the overtime provisions of the MMWL do not apply because the MMWL exempts employers otherwise covered by the FLSA. Grupke does not contest this argument. Michigan law holds that employers subject to the FLSA are not also subject to the MMWL. Mich. Comp. Laws § 408.420(1); *Arrington v. Michigan Bell Tel. Co.*, 746 F. Supp. 2d 854, 857 (E.D. Mich. 2010) (finding that recent amendments to the MMWL did not affect this principle). Accordingly, the Court grants GfK summary judgment on Grupke's MMWL claim.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is granted. The Clerk of the Court is directed to enter judgment and terminate this matter.

Dated: New York, New York          SO ORDERED
      January 28, 2015

                                               PAUL A. CROTTY
                                               United States District Judge